**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                     )

| | |
|---|---|
| MARY DOLAN <br> 4940 Butterworth Place, NW <br> Washington, DC 20016 <br><br>     Plaintiff, <br><br>     v. <br><br> LT. JOSEPH P. KENNEDY <br> INSTITUTE, INC. <br> 924 G Street, NW <br> Washington, DC 20001 <br><br> and <br><br> CATHOLIC CHARITIES OF THE <br> ARCHDIOCESE OF WASHINGTON, INC. <br> 924 G Street, NW <br> Washington, DC 20001 <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Civil Action No. 18-cv-822 <br> ) <br> )    <u>JURY DEMANDED</u> <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**COMPLAINT**

**(Retaliation in Violation of The Rehabilitation Act of 1973, The District of Columbia Human Rights Act, and The Employees of District Contractors and Instrumentality Whistleblower Protection Act of 1998)**

**PARTIES**

1.     Plaintiff Mary Dolan is a resident and citizen of the District of Columbia, and at all times relevant hereto was an employee of Defendants within the meaning of D.C. Code § 2-223.01(3)(B).

2.     Defendant Lt. Joseph P. Kennedy Institute, Inc. ("the Kennedy School") is a non-profit corporation whose principal place of business is in the District of Columbia.  At all times relevant hereto, The Kennedy School was an educational institution within the meaning of D.C.

Code §§2-14-1.02(8); 2-1402.41 and operated federally-funded programs and activities within the meaning of 29 U.S.C. §794.

3. Defendant Catholic Charities of the Archdiocese of Washington, Inc. ("Catholic Charities") is a non-profit corporation whose principal place of business is in the District of Columbia. At all times relevant hereto, Catholic Charities owned and operated The Kennedy School and operated federally-funded programs and activities within the meaning of 29 U.S.C. §794.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343, and 1367.

5. Venue is proper in the District of Columbia pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## FACTS GIVING RISE TO RELIEF

6. In August 2016, Ms. Dolan began working as a special education teacher at the Kennedy School, which is located at 801 Buchanan St NE, Washington, DC 20017.

7. At all times relevant hereto, Ms. Dolan's work performance met Defendants' legitimate job expectations.

8. At all times relevant hereto, Dr. Paris Adon was the principal at the Kennedy School and Ms. Dolan's supervisor.

9. The Kennedy School educated primarily public-school students with disabilities who had been placed at the Kennedy School by local public-school districts pursuant to their obligation under federal law to meet the needs of special education students.

10. During Ms. Dolan's tenure, some of the students at the Kennedy School had been placed there by the District of Columbia Public Schools ("DCPS").

11. During the 2016-17 academic year, Dr. Adon was very focused on increasing student enrollment and maintaining the Kennedy School's financial stability. He frequently mentioned at staff meetings that the school was looking to continue adding students and commented with pride that the school was "in the black" for the first time in years under his leadership.

12. During the fall of 2016, Ms. Dolan became concerned that there were inadequate resources at the Kennedy School to address the educational needs of non-verbal students.

13. During the prior school year, the Kennedy School had terminated the employment of its longtime speech and language pathologist.

14. During the fall of the 2016-17 academic year, the Kennedy School used an independent contractor, Bridgit Jackson, to deliver speech and language pathology ("SLP") services.

15. Ms. Dolan became concerned that Ms. Jackson was not providing the non-verbal students and their teachers with sufficient support and resources in order to implement an ongoing functional method of communication for non-verbal students at the Kennedy School.

16. In October 2016, Ms. Dolan requested a meeting with Dr. Adon to discuss the lack of appropriate alternative communication resources and specifically how that was affecting a particular non-verbal student, Student M. She expressed to Dr. Adon that Student M. should be learning a formal system of communication from someone trained in teaching that method who could teach the method to Student M. and train the staff working with Student M., including herself, in that method. She informed Dr. Adon that she did not believe Ms. Jackson was

adequately trained to carry out that function and that there was no educator on staff who consistently communicated with Student M. and other non-verbal students using any evidence-based communication intervention strategy.

17. Dr. Adon replied that there was "no one answer" as to how to educate non-verbal students and that Ms. Dolan should just keep doing what she was doing and trying different approaches. He noted that Student M. came from a difficult home life and expressed his opinion that the education the Kennedy School was providing Student M. was much better than anything he had ever previously received. Dr. Adon also remarked that "children like [Student M.] do not live long."

18. Ms. Dolan did not think that Student M.'s life expectancy was relevant to whether the Kennedy School was providing him an adequate education, and she advocated that the Kennedy School needed to employ specific intervention models rather than take an ad-hoc approach to teaching communication skills to non-verbal students.

19. Dr. Adon did not provide any guidance regarding resources for implementing any specific communication model for Student M. and reiterated his position that the Kennedy School was doing a good job of educating Student M.

20. Ms. Dolan taught Student M. in her classroom for two periods a day and throughout the fall she never observed Ms. Jackson providing Student M. SLP services in the classroom, nor did she observe Ms. Jackson pulling him out to receive SLP services.

21. Ms. Dolan asked two other staff members, a paraprofessional, Reggie Johnson, and a behavior manager, Derrick, both of whom spent more time with Student M. than Ms. Dolan, if they ever observed Student M. receiving SLP services. They responded that they had not.

22. Based on her experience teaching Student M., Ms. Dolan suspected that Student M.'s Individualized Education Program ("IEP") provided for one-on-one SLP services.

23. The package of special education and related services dictated by Student M's IEP were designed to meet his unique needs; the IEP was the primary safeguard that ensured Student M. received a free appropriate public education ("FAPE") that complied with the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act.

24. Based on her observations and conversations with the paraprofessional and the behavior manager, Ms. Dolan became concerned that Student M. was not receiving the level of services to which he was entitled under federal law.

25. At a student review meeting in or around December 2016, Ms. Dolan raised her concern to Dr. Adon that Student M. was not receiving adequate SLP services. Dr. Adon replied that Student M. "probably" received SLP consultations.

26. Shortly after the meeting, Ms. Dolan reviewed Student M.'s IEP.

27. Student M.'s IEP in effect at that time provided for 240 minutes per month of SLP services.

28. Upon information and belief, Student M. was not receiving 240 minutes per month of SLP services during the fall of 2016.

29. Based on her observations and conversations with the paraprofessional and the behavior manager, Ms. Dolan was skeptical that Student M. was receiving the SLP minutes allotted by his IEP, either through consultations or directly.

30. In or around January 2017, Ms. Dolan attended an IEP meeting for another non-verbal student, Student K.  Ms. Abigail Brandt, the Assistant Principal at the Kennedy School, also attended the meeting, in addition to a speech and language pathologist from DCPS.

31.     At the meeting, the DCPS pathologist recommended removing SLP consultative services from Student K's IEP.  Ms. Dolan disagreed with this decision and voiced her disapproval for removing SLP services from the IEP.

32.     Following the IEP meeting, Ms. Brandt called Ms. Dolan into a meeting with herself and Dr. Adon and chastised Ms. Dolan for disagreeing with the DCPS pathologist.  Ms. Brandt told Ms. Dolan, "stay in your lane."  Ms. Dolan responded that Student K was her student and it was "in my lane" to share her views regarding Student K's communication needs at IEP meetings.

33.     Ms. Brandt told Ms. Dolan she had made the DCPS pathologist mad and that was not good for the Kennedy School.  Ms. Brandt also stated that DCPS could make things difficult for the Kennedy School and that the school wanted to remain in the good graces of DCPS.

34.     Ms. Dolan understood Ms. Brandt to be saying that Ms. Dolan should not disagree with DCPS representatives at IEP meetings because conflict with DCPS might cause it to more closely scrutinize the school, and if DCPS found the school's performance deficient, it could hurt the school's enrollment and financial well-being.

35.     Ms. Dolan was a member of Student K's IEP team.

36.     As a member of the IEP team, it was wholly appropriate for Ms. Dolan to offer input into what constituted an appropriate IEP for Student K during an IEP meeting.

37.     In or around January 2017, Ms. Dolan again requested to meet with Dr. Adon and Ms. Brandt regarding Student M.  Because Dr. Adon was not available, Ms. Dolan met only with Ms. Brandt.

38.     At the meeting, Ms. Dolan told Ms. Brandt that no one who was working with Student M. had seen him receive any SLP services and that accordingly she was concerned that

Student M. was not receiving the level of services provided for in his IEP. Ms. Brandt replied that perhaps the people Ms. Dolan had spoken to were not present when Student M. received or was pulled-out for SLP services. Ms. Dolan replied that of the people she had talked to, someone should have seen some evidence that Student M. was receiving SLP services, and no one had.

39. Ms. Dolan also informed Ms. Brandt that despite asking for Ms. Jackson to consult with her about implementing a formal system of communication for Student M, she had not received any SLP support from Ms. Jackson, that Student M. was not making any progress, and that this further indicated that Student M. was not receiving SLP services. Ms. Dolan then stated directly, "Abby, I don't think this kid is getting his speech services." Ms. Dolan also remarked that if he and other non-verbal students were not getting adequate SLP services they would be entitled to compensatory services—services to remediate the school's previous failure to follow the IEP and therefore provide FAPE.

40. Ms. Brandt, noticeably bothered, stated that Ms. Dolan was making a very serious accusation and that she had no way of knowing all of the services a student receives. Ms. Dolan reiterated the evidence she had to support her belief Student M. was not getting the services to which he was entitled. She also stated that she hoped the Kennedy School was a place where she could speak up if she had concerns because she could not in good conscience stay silent when she observed students not getting the services they needed.

41. A few weeks after Ms. Dolan's conversations with Ms. Brandt about her concern that Student M had not been getting his SLP services, Ms. Dolan learned that Ms. Jackson would not be returning to the Kennedy School for the spring semester.

42. During her time at the Kennedy School, Ms. Dolan also expressed to Ms. Brandt and Dr. Adon her concerns about the behavior of certain paraprofessionals that she thought was harmful to students.

43. In or around December 2016, Ms. Dolan reported to Ms. Brandt that Student M. was physically restrained—held by his wrists—by a paraprofessional. Ms. Dolan informed Ms. Brandt that the catalyst for the physical restraint had been minor acting out for which physical restraint was not appropriate. Ms. Dolan also reported that another paraprofessional punished Student M. by making him face the wall because he spat on her, which Ms. Dolan felt was not appropriate punishment in light of Student M.'s disabilities.

44. Ms. Brandt told Ms. Dolan she would report the concerns to Dr. Adon, but Ms. Dolan never heard from either Ms. Brandt or Dr. Adon about whether they spoke to the paraprofessionals involved regarding these incidents.

45. In March 2017, Ms. Dolan observed the same paraprofessional who had made Student M. face the wall asking him repeatedly for a hug until he acquiesced. Ms. Dolan did not believe it was appropriate for an educator to coerce a student into physical contact. Additionally, given Student M's impairments, she was concerned that the paraprofessional's behavior was sending him mixed messages about how to avoid punishment and please educators.

46. Ms. Dolan reported the incident to Dr. Adon via text message. He responded that she should not submit this type of information via text message. He did not follow up with Ms. Dolan regarding her underlying concern that the reported behavior was inappropriate.

47. On April 3, Ms. Dolan met with Dr. Adon, at her initiation, to raise several concerns regarding the behavior of several paraprofessionals. In addition to the hugging incident and the incidents of inappropriate punishment, Ms. Dolan also reported to Dr. Adon that

paraprofessionals in her classroom were frequently looking at their phones and talking to each other rather than engaging with the students, and that they would talk over Ms. Dolan and ignore her instructions.

48. Dr. Adon listened to her concerns but did not offer Ms. Dolan any information regarding what, if any, actions he would take to address the unprofessional behavior. He did, however, express his belief that the hugging incident "was not a big deal." Ms. Dolan told Dr. Adon that she disagreed.

49. On April 13, 2017, Dr. Adon told Ms. Dolan that the Kennedy School was terminating her employment effective June 30. When asked why he was terminating her employment, Dr. Adon told her it was because her classroom and field trips were disorganized and she was the only teacher who could not get along with the paraprofessionals.

50. Ms. Dolan pointed out that the paraprofessionals' inappropriate behavior was part of the reason her classroom did not run as well as it could and reminded Dr. Adon that she had asked for assistance with that issue several times. She also noted that Dr. Adon had discouraged her from seeking help from the paraprofessionals in executing field trips. Dr. Adon replied that her classroom was her own responsibility.

51. After Ms. Dolan was informed that her employment was being terminated, she had a conversation with one of the paraprofessionals wherein she expressed that she felt the decision to terminate her employment was related to her raising concerns about Student M.'s lack of SLP services. In that conversation the paraprofessional stated that he noticed that "sometimes the advocates take the fall" at the Kennedy School.

52. In May 2017, Ms. Dolan requested from Dr. Adon copies of the classroom observations performed by himself and Ms. Brandt in her classroom. Dr. Adon provided Ms.

Dolan a file containing the classroom observations and other performance evaluations, including her mid-year evaluation from January, of which she already had a copy.

53. Although both documents were dated January 13, 2017, without any notation of subsequent revisions or amendments, the copy of the mid-year evaluation that Ms. Dolan had and the copy from her file that Dr. Adon provided her in May were different in content.

54. The true version of the evaluation that Dr. Adon had provided to Ms. Dolan in January was absent from the file retained by the School.

55. In the copy of the mid-year evaluation provided by Dr. Adon in May, the positive feedback Ms. Dolan had previously received was minimized. A positive comment in the original evaluation— "continue to be an advocate for our students"—had been removed and replaced with, "continue to complete IEP paper work in a timely manner." Another commendation, "continue to prepare lessons with vigor, rigor, and excitement" had been changed to "continue to uplift students with positive announcements."

56. In contrast, the criticism in the "Recommendations" section of the evaluation Dr. Adon provided in May had been amplified. New recommendations had been added, including to "[w]ork to improve your communication with all staff members by asking compared to telling people what to do"; "[w]ork on being a more team oriented teacher"; and "[m]ake an effort to collaborate compared to demanding."

57. The alterations in the evaluation retained in the school file are evidence that the reasons for the termination of Ms. Dolan's employment were pretextual and that the termination was retaliatory.

## COUNT ONE

**(Retaliation in Violation of The Rehabilitation Act of 1973, 29 U.S.C. §794)**

58. Plaintiff incorporates by reference and re-alleges paragraphs 1-57 above.

59. Plaintiff engaged in protected activity when she reported to Dr. Adon and Ms. Brandt that Defendants were not providing non-verbal students with disabilities adequate speech and language services.

60. Plaintiff engaged in protected activity when she reported to Dr. Adon and Ms. Brandt that certain paraprofessionals were inappropriately physically interacting with, punishing, and restraining students with disabilities.

61. Plaintiff engaged in protected activity when she reported to Dr. Adon that certain paraprofessionals were not adequately engaging with the students.

62. Plaintiff had a good-faith belief that the Defendants' actions and omissions with respect to the students discriminated against the students in violation Section 504 of the Rehabilitation Act.

63. Defendants terminated Plaintiff's employment because of her legally protected activities opposing discrimination against students with disabilities in federally-funded programs and activities.

64. Defendants changed their documented professional evaluation of Plaintiff's employment performance because of her legally protected activities opposing discrimination against students with disabilities in federally-funded programs and activities.

65. As a direct and proximate cause of Defendants' intentional retaliation against Plaintiff, she suffered and continues to suffer lost earnings and benefits, embarrassment, humiliation, mental anguish, mental distress, indignity, and loss of enjoyment of life.

## COUNT TWO

**(Retaliation in Violation of the D.C. Human Rights Act, D.C. Code §2-1402.61)**

66.  Plaintiff incorporates by reference and re-alleges paragraphs 1-57 above.

67.  Plaintiff engaged in protected activity when she reported to Dr. Adon and Ms. Brandt that Defendants were not providing non-verbal students with disabilities adequate speech and language services.

68.  Plaintiff engaged in protected activity when she reported to Dr. Adon and Ms. Brandt that certain paraprofessionals were inappropriately physically interacting with, punishing, and restraining students with disabilities.

69.  Plaintiff engaged in protected activity when she reported to Dr. Adon that certain paraprofessionals were not adequately engaging with the students.

70.  Plaintiff had a good-faith belief that the Defendants' actions and omissions with respect to the students discriminated against the students wholly or partially based upon their disabilities in violation the D.C. Human Rights Act.

71.  Defendants terminated Plaintiff's employment because of her legally protected activities opposing discrimination against students with disabilities in an educational institution.

72.  Defendants changed their documented professional evaluation of Plaintiff's employment performance because of her legally protected activities opposing discrimination against students with disabilities in an educational institution.

73.  As a direct and proximate cause of Defendants' intentional retaliation against Plaintiff, she suffered and continues to suffer lost earnings and benefits, embarrassment, humiliation, mental anguish, mental distress, indignity, and loss of enjoyment of life.

74. Defendants' conduct was malicious, wanton, reckless, or done with willful disregard for Plaintiff's rights.

**COUNT THREE**

**(Retaliation in Violation of The Employees of District Contractors and Instrumentality Whistleblower Protection Act of 1998, D.C. Code §2-223.02)**

75. Plaintiff incorporates by reference and re-alleges paragraphs 1-57 above.

76. Plaintiff made a protected disclosure when she reported to Dr. Adon and Ms. Brandt that Defendants were not providing non-verbal students with disabilities adequate speech and language services.

77. Plaintiff made a protected disclosure when she reported to Dr. Adon and Ms. Brandt that certain paraprofessionals were inappropriately physically interacting with, punishing, and restraining students with disabilities.

78. Plaintiff made a protected disclosure when she reported to Dr. Adon that certain paraprofessionals were not adequately engaging with the students.

79. Plaintiff reasonably believed that the Defendants' actions and omissions with respect to the students evidenced violations of law and of the contracts between the District of Columbia and Defendants for the provision of special education services.

80. Defendants terminated Plaintiff's employment because of her legally protected disclosures.

81. Defendants changed their documented professional evaluation of Plaintiff's employment performance because of her legally protected disclosures.

82. As a direct and proximate cause of Defendants' intentional retaliation against Plaintiff, she suffered and continues to suffer lost earnings and benefits, embarrassment, humiliation, mental anguish, mental distress, indignity, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

1. Enter judgment on her behalf against the Defendant on all counts contained herein;

2. Award Plaintiff such damages as would fully compensate her for her injuries caused by Defendant's actions;

3. Award Plaintiff punitive damages;

4. Award Plaintiff her costs, expenses, attorneys' fees, prejudgment interest, and post-judgment interest;

5. Declare that Defendants' conduct is in violation of 29 U.S.C. §794;

6. Declare that Defendants' conduct is in violation of D.C. Code §2-1402.61;

7. Declare that Defendants' conduct is in violation of D.C. Code §2-223.02; and

Grant such other and further relief as this Court deems just and proper.

Dated: April 10, 2018                    Respectfully submitted,

                                         CORREIA & PUTH, PLLC

                                         */s/ Linda M. Correia*
                                         Linda M. Correia (D.C. Bar No. 435027)
                                         Roshni C. Shikari (D.C. Bar No. 1045298)
                                         1775 K Street NW, Suite 600
                                         Washington, D.C. 20006
                                         (202) 602-6500
                                         lcorreia@correiaputh.com
                                         rshikari@correiaputh.com

                                         *Counsel for Plaintiff*

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues contained herein.

>*/s/ Linda M. Correia*_____
>Linda M. Correia (D.C. Bar No. 435027)
>Roshni C. Shikari (D.C. Bar No. 1045298)
>1775 K Street NW, Suite 600
>Washington, D.C. 20006
>(202) 602-6500
>lcorreia@correiaputh.com
>rshikari@correiaputh.com
>
>*Counsel for Plaintiff*