UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY DOLAN,<br><br>    *Plaintiff,*<br><br>v.<br><br>LT. JOSEPH P. KENNEDY<br>INSTITUTE, INC., et al.,<br><br>    *Defendants.* | Case No. 1:18-cv-822-RCL<br><br><u>UNDER SEAL</u> |

## MEMORANDUM OPINION

The Catholic Charities of the Archdiocese of Washington declined to renew Mary Dolan's contract as a special-education teacher at a school run by Catholic Charities — the Lt. Joseph P. Kennedy Institute. In this suit alleging unlawful retaliation, the parties offer two dichotomous narratives to explain why. Ms. Dolan claims that she lost her job at the Institute because she fought back against the Institute's unlawful withholding of speech therapy from students; she describes the Institute as bent on saving money and squelching dissent. Catholic Charities claims that it chose not to renew Ms. Dolan's contract because she mismanaged classroom staff, kept her classroom in disarray, and failed to follow protocols when organizing a field trip; it describes Ms. Dolan as behaving unprofessionally and inappropriately. Because resolving this case requires a factfinder to assess the credibility of competing evidence in weighing those two narratives and determining why the Institute did not renew Ms. Dolan's contract, summary judgment is inappropriate.

Ms. Dolan, however, has established one element of her claims: in not renewing her contract, Catholic Charities took an adverse employment action against her.

Ms. Dolan moved for partial summary judgment (ECF No. 32). Upon consideration of the motion, opposition (ECF No. 39), and reply (ECF No. 40), and all other papers of record, the Court will grant in part and deny in part the motion by separate order.

The defendants moved to exclude Ms. Dolan's expert and strike her expert report (ECF No. 25). Upon consideration of the motion, opposition (ECF No. 26), and reply (ECF No. 27), the Court will deny the motion by separate order.

## I. BACKGROUND

### A. Factual Background[1]

The Individuals with Disabilities Education Act (known as "IDEA") requires the District of Columbia to afford a free and appropriate public education to all children within its jurisdiction. *See* 20 U.S.C. § 1412. To meet that obligation, the District must "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203 (1982).

> Under the statute, the District is obligated to devise Individualized Education Programs ("IEPs") for each eligible child, mapping out specific educational goals and requirements in light of the child's disabilities and matching the child with a school capable of fulfilling those needs. If no suitable public school is available, the District must pay the costs of sending the child to an appropriate private school.

*Jenkins v. Squillacote*, 935 F.2d 303, 304–05 (D.C. Cir. 1991) (citations omitted). The District must periodically review each student's IEP, ordinarily in a meeting with the student's IEP team

---

[1] For convenience, the Court uses the following short forms throughout this opinion to cite to evidence in the Rule 56 record. Citations to "Dolan Evid." refer to the exhibits attached to Pl.'s Mot. Partial Summ. J. (ECF No. 32) and the sealed exhibits filed therewith (ECF No. 33). Citations to "Defs. Evid." refer to the exhibits to Defs.' Mem. Opp'n to Pl.'s Mot. Partial Summ. J. (ECF No. 39). The Court cites to depositions and declarations without reference to the evidentiary compilation in which they appear; it references the docket number only in the first citation to a deposition or declaration.

— composed of his parent, teachers, school district representative, service providers, and other appropriate experts. *See* 20 U.S.C. §§ 1414(a)(2), (d)(1)(B), (d)(4)(A).

The Institute is a non-public school that provides special education to students referred from the District of Columbia Public Schools system ("DCPS"). Dolan Evid., Ex. 4; Defs. Evid., Ex. 14 ¶ 6. Catholic Charities owns and operates the Institute, Answer ¶ 3 (ECF No. 7), and the Institute's principal reports to Catholic Charities management, Adon Dep. 68:22–69:3 (ECF No. 39-2). Catholic Charities employs all of the Institute's teachers, administrators, and other staff; the Institute itself has no employees. Defs. Evid., Ex. 14 ¶ 3. During the 2016–17 school year, under the leadership of principal Paris Adon and assistant principal Abby Brandt, the Institute educated nearly three dozen students, Adon Dep. 159:4–8, and employed dedicated special education teachers and other staff, including classroom aides known as paraprofessionals, *see id.* at 223:10–18 (describing qualifications for paraprofessionals). To provide that education, the Catholic Charities and the Institute received federal funds. Defs. Evid., Ex. 14 ¶¶ 4–5.

This suit concerns, in part, the education and services the Institute provided to two students, whom the parties and the Court refer to as Student K and Student M to protect their anonymity. *See* Fed. R. Civ. P. 5.2. Each had an IEP to address his or her educational needs. Student K suffers from selective mutism, Witte Dep. 90:16–22 (ECF No. 39-7), and her IEP initially required speech therapists to consult with Student K's teachers about treating that condition, *id.* at 94:1–6. Student M has autism, Dolan Evid., Ex. 13 at 4, and his IEP required that he receive speech therapy, *id.* at 21. Student M also had a behavioral management plan governing how the Institute responded to his sometimes-aggressive behavior. Dolan Evid., Ex. 14.

In June of 2016, Catholic Charities hired Ms. Dolan on a one-year contract to serve as a special-education teacher at the Institute. Defs. Evid., Ex. 13. She taught social studies and

English during the 2016–17 school year. *See* Dolan Dep., 48:2–5 (ECF No. 39-4). At the end of March 2017, Dr. Adon decided not to renew Ms. Dolan's contract. Adon Dep., 16:20–17:2.

The parties disagree as to why Dr. Adon made that decision. In her motion, Ms. Dolan points to three events that she says led the school to end her employment: (1) reporting to Ms. Brandt that Student M was not receiving his required speech services, (2) objecting to the DCPS speech pathologist's recommendation to remove Student K's speech services at her annual IEP review meeting, and (3) reporting to Ms. Brandt that a paraprofessional restrained Student M. But Dr. Adon says he declined to reappoint Ms. Dolan because she could not work with the paraprofessionals, because she failed to follow protocols in arranging a field trip, and because she kept her classroom in a state of disarray. *See* Adon Dep. 14:16–15:7. Dr. Adon, however, also says that Ms. Dolan's inability to communicate with DCPS officials at Student K's IEP meeting played a role in his decision. *See id.*

## B. Procedural History and Posture

One year after Dr. Dolan informed Ms. Dolan that Catholic Charities would not renew her contract, Ms. Dolan filed this action. She alleged causes of action under the D.C. Human Rights Act, D.C. Code § 2-1402.61, the Employees of District Contractors and Instrumentality Whistleblower Protection Act ("Whistleblower Act"), D.C. Code § 2-223.02, and the Rehabilitation Act of 1973, Pub. L. 93-112, Title V, § 504, 87 Stat. 394.

Ms. Dolan's motion seeks summary judgment on her Human Rights and Whistleblower Act claims. She also seeks partial summary judgment on two of the elements of her Rehabilitation Act claims — that she engaged in protected activity and that Catholic Charities took an adverse employment action against her.

4

The parties have completed fact discovery, but the Court granted the defendants' motion to stay expert discovery until it resolves the pending motion in limine. *See* Order, Jan. 14, 2020 (ECF No. 29).

## II. LEGAL STANDARDS

### A. Summary Judgment

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of showing its entitlement to summary judgment; the moving party, however, must simply show that the non-moving party has not produced enough evidence to meet its burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The Court construes facts and makes inferences in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). If the parties disagree about material facts, the Court must credit the non-moving party's version. *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016). Facts, however, are disputed only if a reasonable jury could believe either side of the dispute. *See Scott*, 550 U.S. at 380. A fact is material if it is necessary to the Court's decision. *See Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

If the Court cannot grant a motion for summary judgment in full, it may also grant what the rules refer to as partial summary judgment to resolve all or part of a non-dispositive claim or defense. *See* Fed. R. Civ. P. 56(a); *see also Jackson v. Att'y Gen.*, No. CV 18-26 (JEB), 2020 WL 1911540, at *4 (D.D.C. Apr. 20, 2020); 11 *Moore's Federal Practice Civil* § 56.02 (2020) ("In this context, the term 'judgment' is a misnomer. ... [S]ome courts have referred to summary judgment practices that resolve fewer than all claims as resulting in summary 'adjudication' rather than summary 'judgment.'"). An order granting partial summary judgment on an element of a claim is interlocutory and serves to streamline a trial, much like a Rule 16 pretrial order. *See*

5

*Jackson*, 2020 WL 1911540, at *4 ("[P]artial summary judgment can serve a useful brush-clearing function even if it does not obviate the need for a trial . . . .") (quoting *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 606 (7th Cir. 2015)); *see also* 10B Charles Allan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2737 (4th ed., 2020).

### B. Motion in Limine

While neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly provide for motions in limine, the Court may allow such motions "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). In ruling on a motion in limine, the Court appropriately determines whether evidence is admissible at trial but should not resolve factual disputes or weigh evidence. *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10–11 (D.D.C. 2011). "[T]he Court has broad discretion to make judgments about whether proffered evidence is sufficiently relative or overly prejudicial." *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 79 (D.D.C. 2013).

## III. ANALYSIS

### A. Summary Judgment

All three of Ms. Dolan's causes of action require her to prove similar elements. Each requires her to show (1) that she was engaged in a protected activity, (2) that Catholic Charities took an adverse employment action against her, and (3) causation. *See Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (Rehabilitation Act); *Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C. 2008) (Whistleblower Act); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (Human Rights Act).

Because the Rehabilitation Act incorporates by reference the anti-retaliation provisions of the Americans With Disabilities Act of 1990 (known as the "ADA") which in turn incorporates the remedies and procedures in Title VII of the Civil Rights Act of 1964, courts interpret

6

Rehabilitation Act retaliation claims in the same manner as Title VII retaliation claims. *Woodruff*, 482 F.3d at 528; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973) (creating framework for evaluating Title VII claims).

The Court evaluates claims under the Human Rights Act using the same standards. *Murphy v. District of Columbia*, 390 F. Supp. 3d 59, 72 (D.D.C. 2019).

The Court will interpret a claim under the Whistleblower Act as it would interpret a claim under the D.C. Whistleblower Protection Act, a similar statute that applies to the District's employees rather than its contractors. *See United States v. Davis*, 139 S. Ct. 2319, 2329 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning.").

### 1. Protected Activity

Each statute would prohibit Catholic Charities from retaliating against Ms. Dolan if she believed reasonably and in good faith that Catholic Charities' actions denied the students their educational rights.

The Rehabilitation Act prohibits any recipient of a federal grant from retaliating against any person for opposing practices that are unlawful under the act, including denying a special education student his right to a free and adequate public education. *See* 29 U.S.C. § 794 (incorporating ADA employment discrimination standards); 42 U.S.C. § 12203 (prohibiting retaliation under the ADA); 34 C.F.R. § 104.33 (implementing IDEA and the Rehabilitation Act by requiring recipients of federal educational funds to provide a free and adequate public education). To show that the Rehabilitation Act protects her opposition to an unlawful practice, a plaintiff "must have a good faith and reasonable belief that the practices are unlawful." *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013).

The Human Rights Act prohibits retaliation against any person who "aid[s] or encourage[s] any other person in the exercise or enjoyment," D.C. Code § 2-1402.61, of his right to receive an education free from discrimination on the basis of disability, D.C. Code § 2-1402.41. To show that the Human Rights Act protects her conduct, plaintiff must similarly show that "she had a reasonable good faith belief that the practice she opposed was unlawful." *Howard Univ.*, 652 A.2d at 46.

Finally, the Whistleblower Act protects disclosure of information "that an employee reasonably believes evidences" violations of federal laws or regulations or of contracts with the District. D.C. Code § 2-223.01(7).

Ms. Dolan argues that she engaged in protected activity on three occasions: (1) when she reported to Ms. Brandt that Student M was not receiving his required speech services, (2) when she objected to removing student K's speech services at the IEP meeting, and (3) when she reported to Ms. Brandt that a paraprofessional restrained Student M. The record presents triable issues of fact as to whether Ms. Dolan acted reasonably and in good faith on each occasion.

A jury could conclude that Ms. Dolan did not act reasonably or in good faith when she discussed Student M's speech therapy with Ms. Brandt. Ms. Dolan reported that she did not believe Student M was receiving *any* speech therapy because she had never seen Student M removed from her class for speech therapy. Dolan Dep. 66:4–10; Brandt Dep. 90:4–14 (ECF No. 39-3). Yet Ms. Dolan only taught Student M for two periods (90–100 minutes) each day. Dolan Dep. 47:11–14. She does not explain why she believes that Student M could not have received speech therapy during other times during the school day. And Ms. Dolan concedes that she never checked the Institute's record-management system to see if Student M had been receiving his services. Dolan Dep. 67:8–10. A jury could conclude that Ms. Dolan did not have a good faith

basis to believe that the school unlawfully denied Student M his speech services because she never reviewed Student M's records and because she failed to account for the possibility that Student M met with the speech pathologists during other teachers' classes. At the same time, Ms. Dolan offered more than her own personal observations to support her claim that Student M was not receiving services. Student M's records show that he did not receive all the speech therapy time his IEP called for in Fall 2016. *See* Dolan Evid., Ex. 9.[2] Additionally, Ms. Dolan testified that Student M's communication skills did not improve during the Fall semester. Dolan Dep. 66:15–21. Based on that evidence, a jury could support a finding that Ms. Dolan believed in good faith that Student M was not getting the services to which he was entitled. In short, the question of whether Ms. Dolan made her statements about Student M's services reasonably and in good faith present two classic jury questions: (1) whether Ms. Dolan's statements were objectively reasonable and (2) whether Ms. Dolan's testimony as to her subjective beliefs and motive is credible. Accordingly, the Court cannot enter summary judgment on the protected activity element as it relates to Ms. Dolan's statements about Student M's speech therapy.

A jury could conclude that Ms. Dolan did not act reasonably or in good faith in Student K's IEP meeting for similar reasons. When Ms. Dolan objected to the DCPS speech pathologist's recommendation to remove Student K's speech therapy services, she was not familiar with Student K's specific behavioral and mental health diagnoses. *See* Dolan Dep. 76:10–22. Accordingly, when she conducted her research — in the meeting — she was able to draw upon only general

---

[2] Student M was entitled to 240 minutes of speech therapy each month. Dolan Evid., Ex. 8 at 16. Student M received 120 of 240 minutes of speech therapy in December and did not miss any scheduled sessions. Dolan Evid., Ex. 9 at 9. He received 180 of 240 minutes of speech therapy in November and missed one session because of a school holiday. *Id.* at 10. He received all 240 minutes of speech therapy in October and missed one session because of a school holiday. *Id.* at 11. And he received 120 of 240 minutes of speech therapy in September and missed two or three sessions because of absences and school holidays. *Id.* at 13. In February 2017, the Institute acknowledged that Student M was entitled to 420 minutes of make-up speech therapy. Dolan Evid., Ex. 12.

9

guidance to contest specific recommendations. Moreover, she did not discuss her concerns with anyone else on the IEP team before the meeting, which others indicate would have been standard practice. *See* Chaffee Dep. 95:7–11; Brandt Dep. 83:12–17; Witte Dep. 70:19–71:11. Accordingly, a jury could conclude that Ms. Dolan did not have an adequate grasp of Student K's needs to believe in good faith that the Institute would deny Student K her educational rights by removing her speech services. At the same time, a jury could reach the opposite conclusion because evidence suggests that speech services may have assisted Student K. *See* Dolan Evid., Ex. 23. Therefore, a jury must decide whether Ms. Dolan acted reasonably and in good faith.

Finally, a jury could conclude that Ms. Dolan did not act reasonably or in good faith in reporting a paraprofessional's use of physical restraint techniques against Student M. A teacher must notify the police or Child and Family Services if she believes that a child has been physically abused. D.C. Code § 4-1321.02. While Ms. Dolan told Ms. Brandt that she believed a paraprofessional had physically restrained Student M in violation of his behavioral plan, Dolan Dep. 97:5–19, she did not report the incident to the police or to child welfare authorities, *id.* at 97:1–100:5. In her deposition, Ms. Dolan said that she did not contact the appropriate authorities — beyond talking to Ms. Brandt — because she did not think the incident was a serious enough to warrant outside reporting. *Id.* at 100:3–5. Based on Ms. Dolan's decision not to report the incident — effectively saying that the paraprofessional's conduct either did not harm Student M or was a privileged form of discipline, *see* D.C. Code §§ 4-1301.02(1)(A), 16-2301(23) —a jury could conclude that she did not believe in good faith that the paraprofessional behaved unlawfully. But because Ms. Dolan believed the conduct serious enough to report to Ms. Brant, a jury could find that Ms. Dolan believed the paraprofessional's conduct unlawfully violated Student M's

10

behavioral plan. Therefore, whether this incident constitutes protected conduct likewise presents a jury question.

Finally, the defendants argue that Ms. Dolan cannot succeed on any claims unless she directly argued that the defendants' conduct was unlawful. None of the statutes at issue impose strict pleading standards on an employee who objects to behavior that she reasonably believes to be unlawful. If Ms. Dolan made her statements reasonably and in good faith, she engaged in a protected activity.

### 2. Adverse Employment Action

Ms. Dolan argues that Catholic Charities' decision not to renew her appointment constitutes an adverse employment action under all three statutes. She is correct and is entitled to summary judgment on that element of all three claims.

For the purposes of a retaliation claim, an adverse employment action is any action that "could well dissuade a reasonable worker." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (articulating standard in the context of Title VII). Non-renewal of a contract is no less likely to dissuade an employee from taking a protected action than outright termination. In recognition of that self-evident fact, the Courts of Appeals have uniformly accepted non-renewal as an adverse employment action under the more demanding standards required to make out a claim for discrimination. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009) (collecting cases).

The defendants fail to rebut Ms. Dolan's argument. At best, they note that the Circuit has yet to decide that failure to renew a contract constitutes an adverse employment action. *See Ghori-Ahmad v. U.S. Comm'n on Int'l Religious Freedom*, 969 F. Supp. 2d 1, 8 (D.D.C. 2013). That may be so. But the lack of a controlling precedent is not the same thing as "no legal precedent

11

based upon which this Court can rule as a matter of law." Defs.' Br. 28 (ECF No. 39). Looking both to persuasive precedent from other circuits and the basic fact that non-renewal of a contract would dissuade a reasonable worker from engaging in a protected activity, the Court holds that failing to renew Ms. Dolan's appointment was an adverse employment action.

Ms. Dolan is entitled to summary judgment on the adverse action element of all three claims.

### 3. Causation

In assessing whether the plaintiff has shown causation, courts use a burden-shifting framework under both of the D.C. statutes.

The Human Rights Act employs a three-part framework. First, the plaintiff must establish that the protected action was a substantial contributing factor towards the adverse employment action. Then, the defendant must show a legitimate reason it took the adverse employment action. Finally, the plaintiff bears the ultimate burden of producing evidence that the employer's legitimate reason was a mere pretext and that the employer took the adverse employment action for a prohibited reason. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 368 (D.C. 1993). The Human Rights Act requires the plaintiff to show pretext and causation by the preponderance of the evidence. *Arthur Young*, 631 A.2d at 369.

Under the Whistleblower Act, once the plaintiff demonstrates that her protected actions were a contributing factor towards the adverse employment action, the defendant must show by clear and convincing evidence that the action was legitimate. *See* D.C. Code § 2-223.03; *cf. Freeman v. District of Columbia*, 60 A.3d 1131, 1141 (D.C. 2012) (applying parallel statute). A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." D.C. Code. § 2-223.01. Despite that broad statutory

definition, the D.C. Court of Appeals requires a plaintiff to show that her disclosure was the but-for cause of the adverse action. *Cf. Johnson v. District of Columbia*, 935 A.2d 1113, 1119 (D.C. 2007) (applying parallel statute).

Disputed material facts prevent the Court from granting summary judgment to Ms. Dolan under either statute because a jury could conclude that Dr. Adon did not rely on potentially protected statements in declining to renew her appointment.

The defendants have offered legitimate reasons for not renewing Ms. Dolan's contract. Dr. Adon told Catholic Charities' human resources director that he did not want to renew Ms. Dolan's contract because she kept her classroom in "utter disarray," he received complaints from the paraprofessionals in Ms. Dolan's classroom, Ms. Dolan failed to properly organize a field trip, and Ms. Dolan left the classroom while Dr. Adon was demonstrating a lesson for her benefit. Waterman Dep. 23:1–26:6 (ECF NO. 39-8). In his deposition, Dr. Adon listed his reasons for not renewing Ms. Dolan's employment as her poor performance, "inability to keep her classroom clean, "inability to interact with staff members," and "inability to communicate effectively" at Student K's IEP meeting. *See* Adon Dep. 14:16–15:7. And according to Ms. Dolan, Dr. Adon gave her similar reasons for not renewing her contract: that she was a bad fit, that her room and field trips were disorganized, and that she did not get along with the paraprofessionals. *See* Dolan Dep. 126:5–10. The record thus reflects that Dr. Adon offered more-or-less consistent reasons for ending Ms. Dolan's employment. And the record contains ample support for each of those grounds:

- Ms. Dolan acknowledges her classroom was messy at times, Dolan Dep. 126:14–16, and others describe it as being "mess[y]," Adon Dep. 63:5, "junky," *id.*,

13

"unorganized," *id.* at 45:6, trash strewn, *id.* at 120:4–5, and in "utter disarray," Waterman Dep. 23:2–3.

- Ms. Dolan acknowledges that she had a difficult time working with some paraprofessionals, *see* Dolan Dep. 94:5–16, 95:4–96:13, and others agree, *see, e.g.*, Adon Dep. 40:14–16 (paraprofessional asked not to be assigned to Ms. Dolan's classroom); *id.* at 47:14–19 (same); Brandt Dep. 53:21–22 (paraprofessional described Ms. Dolan as difficult to work with).

- Dr. Adon, Adon Dep. 286:19–287:19, Ms. Brandt, Brandt Dep. 70:22–71:1, and another teacher, Chaffee Dep. 84:12–85:8 (ECF No. 39-10), all recount organizational problems with a field trip Ms. Dolan planned.

- Ms. Dolan acknowledges that she left her classroom during Dr. Adon's demonstration. Dolan Dep. 123:15–124:4; *see also* Brandt Dep. 73:4–10 (describing incident as indicative of Ms. Dolan's inability to take feedback).

- Other participants in the IEP meeting describe Ms. Dolan's conduct as unprofessional and inappropriate. *See* Brandt Dep. 83:1, 82:10–12; Fenwick Dep. 50:14–16, 73:11–12 (ECF No. 39-9); Davis Decl. ¶¶ 20–21, 23, 25 (ECF No. 39-12).

Accordingly, the record would support a conclusion that Catholic Charities had legitimate grounds for declining to renew Ms. Dolan's contract.

Whether the evidence "will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established," *Lewis v. Estate of Lewis*, 193 A.3d 139, 144 (D.C. 2018), to meet the Whistleblower Act's clear and convincing evidence standard is a question

for the jury. If the jury gave limited credence to Ms. Dolan's testimony, it could reach that conclusion.

Because Catholic Charities has proffered legitimate grounds for declining to renew Ms. Dolan's appointment, to prevail on the causation element of her Human Rights Act claim, Ms. Dolan must show that those proffered grounds were mere pretext to hide retaliation.

For two of the potentially protected activities on which Ms. Dolan bases her retaliation claims — reporting to Ms. Brandt that Student M was not receiving his required speech services, and reporting to Ms. Brandt that a paraprofessional restrained Student M — Ms. Dolan has not offered evidence that Dr. Adon considered those acts when he decided not to renew her contract. While a jury could rely on temporal proximity to conclude that Dr. Adon acted because of those acts, *see Propp v. Counterpart Int'l*, 39 A.3d 856, 868 (D.C. 2012), Ms. Dolan has not met her burden to show pretext at this stage.

With respect to the IEP meeting, Ms. Dolan has come closer to showing pretext. Dr. Adon acknowledges that Ms. Dolan's conduct in Student K's IEP meeting contributed to his decision not to reappoint Ms. Dolan.[3] Adon Dep. 14:20–15:6. If he decided not to renew her contract because of the content of her objections, he may have engaged in unlawful retaliation. If, however, he decided not to renew her contract because she behaved inappropriately or unprofessionally in the meeting, Ms. Dolan cannot invoke statutory protections against retaliation. *Cf. Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 & n.20 (5th Cir. 1999) (rejecting ADA retaliation claim). Ms.

---

[3] The defendants also argue that Catholic Charities' human resources director, Christopher Waterman, made the final decision to terminate Ms. Dolan did not know about her statements in the meeting. *See* Defs.' Br. 20, 32. In his deposition, Mr. Waterman testified that Dr. Adon needed his approval to decide not to renew Ms. Dolan's contract. Waterman Dep. 21:4–13. But he also testified that he made his decision based solely on what Dr. Adon told him, *id.* at 27:10–15, and that he defers to Dr. Adon's expertise on staffing questions at the Institute, *id.* at 26:13–27:2, 30:15–31:4, 31:16–32:2. Because Mr. Waterman relied solely on Dr. Adon's recommendation in approving the non-renewal decision, Dr. Adon's recommendation caused Catholic Charities not to renew Ms. Dolan's contract. *See Morris v. McCarthy*, 825 F.3d 658, 672 (D.C. Cir. 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)). Accordingly, the Court looks to Dr. Adon's thinking to answer questions of causation.

15

Dolan's claim, therefore, will succeed or fail based on Dr. Adon's state of mind. And her conduct at the meeting provides important circumstantial evidence as to his thinking.

While everyone agrees that in that meeting, Ms. Dolan objected to the recommendation of DCPS's speech pathologist to remove speech therapy from Student K's IEP, participants in the meeting disagree about how she voiced those objections. Ms. Dolan recalls "an exchange back and forth for a few minutes." Dolan Dep. 78:9–10. She does not recall anyone telling her that it was time to move on. *Id.* at 80:16–18. She does not recall talking over anyone else, *id.* at 83:1–3, raising her voice, *id.* at 82:4–6, or getting emotional, *id.* at 82:9–12. Ms. Dolan also testified that she "quickly Googled" a trade association's recommendations for treating Student K's condition and shared those recommendations with the other meeting participants. *Id.* at 77:21–78:5. Others characterize the encounter differently. Ms. Brandt says she waylaid the conversation for ten minutes, *id.* at 82:10–12, 83:1, cut people off, *id.* at 82:10–12, and refused to accept a consensus to remove Student K's speech services accepted by the speech experts and Student K's father, *id.* at 83:2–11. One participant describes Ms. Dolan as "verbally aggressive" and "extremely agitated," Fenwick Dep. 50:14–16, and said that she "bark[ed]" at the other participants, *id.* at 73:11–12. The DCPS representative at the meeting said Ms. Dolan appeared "unprepared," Davis Decl. ¶ 20, and offered unpersuasive, generic information she Googled in the meeting to support her claims, *id.* at ¶ 21. She describes Ms. Dolan as "bec[oming] overly emotional and passionate," unable to support her beliefs with particularized arguments, and unwilling to accept experts' conclusions or their expertise. *Id.* at ¶ 23. After the meeting, the expert told Ms. Brandt that she viewed Ms. Dolan's outburst as "inappropriate and unprofessional." *Id.* at ¶ 25.

Ultimately, the question of whether Ms. Dolan acted reasonably or in good faith relies on weighing and crediting or discrediting competing testimonies. Only a jury can do that.

\* \* \*

As a matter of law, Catholic Charities' decision not to renew Ms. Dolan's contract constitutes an adverse employment action. But as to the other elements of Ms. Dolan's claims, she must face a jury if she is to prevail. A reasonable jury could credit Ms. Dolan's account of Student K's IEP meeting and discredit Dr. Adon's proffered reasons for non-renewal and accordingly return a verdict for the plaintiff. But a reasonable jury could also accept Dr. Adon's reasons for non-renewal and reject Ms. Dolan's account of the IEP meeting and accordingly return a verdict for the defendants. Construing the contested facts in favor of the defendants, the Court holds that Ms. Dolan is not entitled to summary judgment.

### B. Motion in Limine

Pursuant to Federal Rule of Civil Procedure 26(a)(1)–(2), Ms. Dolan disclosed to the defendants information about her expert witness and the report the expert produced. The expert, a speech and language pathologist with more than two decades of experience, reviewed Ms. Dolan's deposition, the complaint, and records pertaining to Students K and M. Based on her review of those documents, she offered her opinion on whether speech therapy would have been helpful to Students K and M and thus whether their IEPs should have included speech therapy.

The defendants moved to exclude Ms. Dolan's expert and to strike the expert's report. Their motion cites Federal Rules of Evidence 403, 702, and 703, *see* Defs' Mot. to Exclude and Strike 1, though their brief also argues irrelevance (Rule 401), *see* Mem. P. & A. Supp. Mot. to Exclude and Strike 5–7. The Court will deny the motion.

First, Ms. Dolan's expert will offer relevant evidence. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. To meet that low standard, the expert's evidence need only provide one tiny brick in the wall Ms. Dolan will attempt to build. *Cf.* Fed. R. Evid. 401, advisory committee's note (1972). Here, Ms. Dolan must show that she believed in good faith that the Institute improperly denied speech services to Students K and M. If the Institute in fact improperly denied those students services, that fact would lend support to Ms. Dolan's contention that she believed an improper denial had occurred. *Cf. United States v. James*, 169 F.3d 1210, 1214 (9th Cir. 1999) (holding fact that person had committed offense relevant to whether he told another that he had the offense). The expert's evidence would make that consequential fact more probable and is therefore logically relevant to the case.

Second, the expert's evidence would be helpful to a jury. "[T]rial courts ought to approach exclusion gingerly, and should admit the testimony if there is any chance at all that it will be beneficial to the trier of fact." 4 *Weinstein's Federal Evidence* § 702.03 (2020). The expert's report contextualizes evidence in the record by explaining speech therapy practices and systems. *See* Mot. to Exclude and Strike, Ex. 1. She links general scientific ideas and practices to the facts in the case and explains what services she believes the Institute should have provided Students K and M. Those scientific details are not common knowledge; therefore, expert testimony would help the jury determine whether Ms. Dolan's arguments about Student K and M were reasonable. Defendants argue that the expert's report opines on Ms. Dolan's credibility and makes legal conclusions; the report does neither. The expert may not testify as to whether Ms. Dolan should be believed; she may, however, and does offer evidence as to whether established scientific practices would support Ms. Dolan's demands for services. And the expert may opine on what a

18

students IEP should contain. *See Copeland v. District of Columbia*, 82 F. Supp. 3d 462, 470 (D.D.C. 2015) (noting appropriateness of expert testimony in establishing what services should be in IEPs). The expert's testimony would assist a jury in resolving this case.

Third, the defendants have not established that the expert's evidence is substantially more prejudicial than probative. A party seeking to exclude evidence for unfair prejudice must show that the evidence should be excluded. *See* Fed. R. Evid. 403. Beyond a bare assertion, *see* Mem. P. & A. Supp. Mot. to Exclude and Strike 7 ("Ms. Douglas' Opinions Are Overly Prejudicial"), the defendants have offered the Court no reason to believe that the expert's report would be prejudicial. Therefore, the defendants have not met their burden.

The Court will overrule the defendants' evidentiary objections and deny their motion in limine.

## IV. CONCLUSION

Based on the foregoing, the Court will grant Ms. Dolan summary judgment on the adverse employment element of each of her claims, deny Ms. Dolan summary judgment in all other respects, and deny the motion in limine. A separate order accompanies this opinion.

Date: July 17, 2020

Royce C. Lamberth
United States District Judge